UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-7151

DENNIS LEBLANC,

Petitioner - Appellee,

v.

RANDALL MATHENA, Chief Warden, Red Onion State Prison,
Pound, Virginia; COMMONWEALTH OF VIRGINIA,

Respondents - Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Norfolk. Arenda L. Wright Allen,
District Judge. (2:12-cv-00340-AWA-LRL)

Argued: May 10, 2016                    Decided: November 7, 2016

Before NIEMEYER and WYNN, Circuit Judges, and Thomas E.
JOHNSTON, United States District Judge for the Southern District
of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Wynn wrote the opinion, in
which Judge Johnston joined. Judge Niemeyer wrote a dissenting
opinion.

**ARGUED**: Stuart Alan Raphael, OFFICE OF THE ATTORNEY GENERAL OF
VIRGINIA, Richmond, Virginia, for Appellants. Bryan A.
Stevenson, EQUAL JUSTICE INITIATIVE, Montgomery, Alabama, for
Appellee. **ON BRIEF**: Mark R. Herring, Attorney General of
Virginia, Linda L. Bryant, Deputy Attorney General, Criminal
Justice & Public Safety Division, Donald E. Jeffrey, III, Senior
Assistant Attorney General, Eugene P. Murphy, Senior Assistant

Attorney General, Katherine Quinlan Adelfio, Assistant Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Jennifer T. Stanton, J.T. STANTON, P.C., Norfolk, Virginia; Randall S. Susskind, Jennae R. Swiergula, Stephen Chu, EQUAL JUSTICE INITIATIVE, Montgomery, Alabama, for Appellee.

_____

WYNN, Circuit Judge:

Graham v. Florida, 560 U.S. 48, 74 (2010), held that "the Eighth Amendment forbids the sentence of life without parole" for juvenile offenders convicted of nonhomicide offenses. Accordingly, the Supreme Court held that States must provide juvenile nonhomicide offenders sentenced to life imprisonment with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 75.

Nearly a decade before the Supreme Court decided Graham, Respondent, the Commonwealth of Virginia, sentenced Petitioner Dennis LeBlanc to life imprisonment without parole for a nonhomicide offense he committed at the age of sixteen. In light of Graham, Petitioner sought postconviction relief from his sentence in Virginia state courts. The state courts denied Petitioner relief, holding that Virginia's geriatric release program--which was adopted more than fifteen years before the Supreme Court decided Graham and will allow Petitioner to seek release beginning at the age of sixty--provides the "meaningful opportunity" for release that Graham requires.

Mindful of the deference we must accord to state court decisions denying state prisoners postconviction relief, we nonetheless conclude that Petitioner's state court adjudication constituted an unreasonable application of Graham. Most significantly, Virginia courts unreasonably ignored the plain

3

language of the procedures governing review of petitions for geriatric release, which authorize the State Parole Board to deny geriatric release for any reason, without considering a juvenile offender's maturity and rehabilitation. In light of the lack of governing standards, it was objectively unreasonable for the state courts to conclude that geriatric release affords Petitioner with the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" Graham demands. Id. Accordingly, Petitioner is entitled to relief from his unconstitutional sentence.

I.

On July 15, 2002, a Virginia state trial court found Petitioner guilty of rape and abduction. Petitioner committed the offenses on July 6, 1999, when he was sixteen years old. The court sentenced Petitioner to two terms of life imprisonment. Petitioner was ineligible for parole pursuant to Va. Code Ann. § 53.1-165.1, which abolished parole for individuals convicted of a felony committed after January 1, 1995. Petitioner did not appeal his conviction or sentence.

In 2011, Petitioner filed a motion to vacate his sentence in state trial court. The motion argued that Graham rendered Petitioner's life sentence invalid. In opposition, Respondents asserted that, notwithstanding Virginia's abolition of parole, Petitioner's life sentence did not violate Graham because

4

Virginia allows for conditional release of "geriatric prisoners," Va. Code Ann. § 53.1-40.01 ("Geriatric Release").

At a hearing on August 9, 2011, the state trial court orally denied Petitioner's motion to vacate. In rendering its decision, the trial court relied on the Supreme Court of Virginia's decision in Angel v. Commonwealth, 704 S.E.2d 386 (Va. 2011), which held that Geriatric Release provides juveniles sentenced to life in prison a "meaningful opportunity for release" and therefore complies with Graham's parole requirement. J.A. 157. Petitioner appealed the trial court's decision to the Supreme Court of Virginia, which summarily denied his petition for appeal.

On June 19, 2012, Petitioner filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Virginia. A federal magistrate judge reviewed the petition and recommended that the district court deny it. LeBlanc v. Mathena, No. 2:12-cv-340, 2013 WL 10799406, at *1 (E.D. Va. July 24, 2013). Petitioner filed objections to the magistrate judge's report. Finding the objections well-taken, the district court granted Petitioner's habeas petition, holding that his state court adjudication was contrary to, and an unreasonable application of, Graham. LeBlanc v. Mathena, No. 2:12cv340, 2015 WL 4042175, at *9 (E.D. Va. July 1, 2015). In particular, the district court concluded

5

that Geriatric Release does not offer juvenile offenders sentenced to life imprisonment, like Petitioner, the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" required by Graham. Id. at *9, *11–18. The district court further concluded that Geriatric Release did not comply with Graham's dictate that state penal systems reflect the lesser culpability of juvenile offenders, explaining that Geriatric Release "treats children worse" than adult offenders. Id. at *14 (emphasis in original). Accordingly, the district court remanded Petitioner's case to the state court for resentencing in accordance with Graham. Id. at *19.

Respondents filed a timely appeal, and the district court stayed its judgment pending resolution of that appeal.

## II.

### A.

The Virginia General Assembly established Geriatric Release in 1994--more than 15 years before the Supreme Court decided Graham--as part of its "truth-in-sentencing" reform package. J.A. 169. The primary goal of truth-in-sentencing reform was to close the gap between prisoners' original sentences and the amount of time they actually served. Brian J. Ostrom et al., Truth-in-Sentencing in Virginia 17-20 (April 5, 2001), available at https://www.ncjrs.gov/pdffiles1/nij/grants/187677.pdf. The centerpiece of the reform package was the elimination of parole

6

for all offenders who committed felonies on or after January 1, 1995.  Id.

The statutory provision governing Geriatric Release, as amended,[1] provides, in its entirety:

> Any person serving a sentence imposed upon a conviction for a felony offense, other than a Class 1 felony, (i) who has reached the age of sixty-five or older and who has served at least five years of the sentence imposed or (ii) who has reached the age of sixty or older and who has served at least ten years of the sentence imposed may petition the Parole Board for conditional release.  The Parole Board shall promulgate regulations to implement the provisions of this section.

Va. Code Ann. § 53.1-40.01.  Unlike with other components of the truth-in-sentencing reform package,[2] we have identified no evidence in the contemporaneous legislative record speaking to the General Assembly's goal in enacting Geriatric Release or providing guidance regarding the implementation of Geriatric Release.

---

[1] The original provision applied only to offenders who were ineligible for parole.  A 2001 amendment expanded the provision to apply to all inmates.

[2] The legislative history of the truth-in-sentencing reform package focuses on the abolition of parole, establishment of uniform sentencing guidelines and a sentencing commission, elimination of "good time" credits, and imposition of longer sentences for violent offenders.  Commonwealth of Va. Comm'n on Sentencing & Parole Reform, Report of the Commission on Sentencing & Parole Reform to the Governor and General Assembly of Virginia, H. Doc. No. 18 (Dec. 23, 1994).

The Virginia Parole Board is responsible for deciding whether to grant petitions for Geriatric Release. Section 53.1-40.01 directs the Parole Board to promulgate regulations necessary to implement the statute. Pursuant to that authority, the Parole Board established administrative procedures governing implementation of the Geriatric Release provision (the "Geriatric Release Administrative Procedures").

The Geriatric Release Administrative Procedures set forth a two-stage review process for Geriatric Release petitions. At the "Initial Review" stage, the Parole Board reviews a prisoner's petition--which must provide "compelling reasons for conditional release"--and the prisoner's "central file and any other pertinent information." J.A. 287. The Parole Board may deny the petition at the Initial Review stage based on a majority vote. Neither the statute nor the Geriatric Release Administrative Procedures states what constitute "compelling reasons for conditional release," nor does either document require the Parole Board to consider any particular factors in conducting the Initial Review, nor does either document set forth any criteria for granting or denying a prisoner's petition at the Initial Review stage.

If the Parole Board does not deny a petition at the Initial Review stage, the petition moves forward to the "Assessment Review" stage. As part of the Assessment Review, a Parole Board

8

member or designated staff member interviews the prisoner. During that interview, the prisoner may present written and oral statements as well as any written material bearing on his case for parole. The interviewer then drafts a written assessment of the prisoner's "suitability for conditional release" and, based on that assessment, recommends whether the Parole Board should grant the petition. J.A. 288. In order to grant Geriatric Release to a prisoner sentenced to life imprisonment, at least four members of the five-member Parole Board must vote in favor of release.

In engaging in the Assessment Review, Parole Board members should consider "[a]ll factors in the parole consideration process including Board appointments and Victim Input." Id. The Virginia Parole Board Policy Manual includes a long list of "decision factors" to be considered in the parole review process. J.A. 297. These factors include: public safety, the facts and circumstances of the offense, the length and type of sentence, and the proposed release plan. The Parole Board also should consider certain characteristics of the offender, including "the individual's history, physical and mental condition and character, . . . conduct, employment, education, vocational training, and other developmental activities during incarceration," prior criminal record, behavior while incarcerated, and "changes in motivation and behavior." J.A.

9

297-99.  Finally, the Parole Board should consider impressions gained from interviewing the prisoner as well as information from family members, victims, and other individuals.

B.

There are several key ways in which Geriatric Release differs from Virginia's parole system, which remains in place for prisoners who committed their offenses before January 1, 1995.  The first--and most obvious--is the age limitation.  In order to seek Geriatric Release, an inmate must be at least sixty years of age.  By contrast, most parole-eligible inmates serving a life sentence will be considered for parole for the first time after serving fifteen years of their sentence.  Va. Code Ann. § 53.1-151(C).  Other prisoners will be considered for parole when they serve a certain percentage of their sentence. Id. § 53.1-151(A).  Accordingly, whereas Petitioner would have been considered for parole after serving twenty years of his sentence, Petitioner cannot apply for Geriatric Release until roughly twenty years later.

The second difference is that an inmate must actively petition for Geriatric Release once he or she becomes eligible, whereas the Parole Board automatically considers, on an annual basis, whether to release each parole-eligible inmate.

A third difference is that, unlike with parole, the Parole Board may deny a petition for Geriatric Release at the Initial

10

Review stage without considering any of the "decision factors" enumerated in the Parole Board Policy Manual. Indeed, unlike the parole system, which has established criteria that the Parole Board must consider in granting or denying parole, Geriatric Release affords the Parole Board unconstrained discretion to deny a petition for Geriatric Release at the Initial Review stage. Relatedly, in their petition, prisoners must "identify compelling reasons" why they should receive Geriatric Release, notwithstanding that the "compelling reasons" requirement has no statutory basis and that the Geriatric Release Administrative Procedures do not provide any guidance regarding what constitutes a "compelling reason." J.A. 287. By contrast, there is no requirement that a parole-eligible inmate demonstrate "compelling reasons" in order to obtain parole.

Fourth, the Parole Board or its designee interviews prisoners undergoing parole review as a matter of course. By contrast, the Parole Board can deny a petition for Geriatric Release at the Initial Review stage "on a review of the record," without interviewing the inmate. J.A. 287.

A final notable difference is that four members of the five-member Parole Board must approve Geriatric Release of inmates sentenced to life imprisonment. By contrast, only three members of the Parole Board must approve parole of parole-eligible prisoners.

11

## II.

We review the district court's decision to grant Petitioner's habeas petition de novo. Richardson v. Branker, 668 F.3d 128, 138 (4th Cir. 2012). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which accords deference to final judgments of state courts, circumscribes our review. Nicolas v. Att'y Gen. of Md., 820 F.3d 124, 129 (4th Cir. 2016). Under AEDPA, a federal court may grant habeas relief to a state prisoner, like Petitioner, if the prisoner's state court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," id. § 2254(d)(2).

Respondents contend that the Virginia courts' conclusion that Geriatric Release complies with Graham's parole requirement amounted to a finding of fact, and therefore that the standard set forth in 28 U.S.C. § 2254(d)(2) applies. Federal courts review habeas petitions raising questions of law or mixed questions of law and fact under Section 2254(d)(1). Horn v. Quarterman, 508 F.3d 306, 312 (5th Cir. 2007); see also, e.g., Barnes v. Joyner, 751 F.3d 229, 246-52 (4th Cir. 2014) (analyzing habeas petition raising mixed question of law and

12

fact under Section 2254(d)(1)).  By contrast, Section 2254(d)(2) applies to questions of historical fact. <u>Weaver v. Palmateer</u>, 455 F.3d 958, 963 n.6 (9th Cir. 2006); <u>Ouber v. Guarino</u>, 293 F.3d 19, 27 (1st Cir. 2002) ("[T]he special prophylaxis of section 2254(d)(2) applies only to determinations of basic, primary, or historical facts." (internal quotation omitted)).

Here, the Virginia courts' evaluation of whether Geriatric Release complies with <u>Graham</u>'s parole requirement implicates questions of law, and therefore is subject to review under Section 2254(d)(1).  <u>See, e.g.</u>, <u>Moore v. Biter</u>, 725 F.3d 1184, 1191 (9th Cir. 2013) (holding that a state court decision was contrary to clearly established law when it held that <u>Graham</u> did not bar a juvenile nonhomicide offender's sentence under which he would be eligible for parole in 127 years); <u>Bunch v. Smith</u>, 685 F.3d 546, 549-50 (6th Cir. 2012) (analyzing whether 89-year sentence was functional equivalent of life sentence for purposes of <u>Graham</u> under Section 2254(d)(1)).  Therefore, we must determine whether the state court's decision was "contrary to, or involved an unreasonable application of clearly established" Supreme Court law.  28 U.S.C. § 2254(d)(1).

In assessing a state prisoner's habeas claims, we review the "last reasoned" state court decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991); <u>Grueninger v. Dir., Va. Dep't of Corrs.</u>, 813 F.3d 517, 525 (4th Cir. 2016).  "Unless a state-

13

court opinion adopts or incorporates the reasoning of a prior opinion, AEDPA generally requires federal courts to review one state decision." Wooley v. Rednour, 702 F.3d 411, 421 (7th Cir. 2012) (internal quotation omitted). However, "[i]f the last reasoned decision adopts or substantially incorporates the reasoning from a previous state court decision, we may consider both decisions to fully ascertain the reasoning of the last decision." Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (internal quotation omitted); Brian R. Means, Federal Habeas Manual § 3:7 (2016) ("[W]here the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous decision, it is acceptable for the federal court to look at both state court decisions to fully ascertain the reasoning of the last decision.").

The Supreme Court of Virginia summarily affirmed the trial court's oral denial of Petitioner's motion to vacate. Accordingly, the trial court decision constitutes the last reasoned decision for purposes of our analysis. Nicolas, 820 F.3d at 129. The trial court relied on Angel's reasoning regarding the Geriatric Release provision's compliance with Graham's parole requirement. Accordingly, we must consider both the trial court's decision and Angel in determining whether Petitioner's state court adjudication was "contrary to, or an

14

unreasonable application of" Graham--the question to which we now turn.

III

A.

The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; Roper v. Simmons, 543 U.S. 551, 560 (2005). "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" Graham, 560 U.S. at 58 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." Solem v. Helm, 463 U.S. 277, 284 (1983).

Graham rests on a long line of Supreme Court decisions addressing the constraints imposed by the Eighth Amendment on the punishment of juvenile offenders. In Thompson v. Oklahoma, 487 U.S. 815, 838 (1988), the Supreme Court held that the Eighth Amendment prohibits the death penalty for offenders who committed their crimes before the age of sixteen. The Court grounded its decision on the principle "that punishment should be directly related to the personal culpability of the criminal defendant." Id. at 834 (quoting California v. Brown, 479 U.S.

15

538, 545 (1987)). "[A]dolescents as a class are less mature and responsible than adults," the Court explained. Id. "Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult." Id. at 835. Accordingly, a juvenile's transgression is "not as morally reprehensible as that of an adult." Id. Because juvenile offenders are not as personally culpable as adult offenders, juvenile offenders should not receive punishments as severe as those inflicted on adult offenders, the Court held. Id. at 834.

In Roper v. Simmons, the Supreme Court again emphasized the unique characteristics of youth when it extended Thompson's bar on the death penalty to all individuals who committed their offenses before the age of eighteen. 543 U.S. at 578. Like Thompson, the Roper Court highlighted juveniles' "lack of maturity and underdeveloped sense of responsibility" and propensity for "reckless behavior." Id. at 569 (citations omitted). Roper further noted that "the character of a juvenile is not as well formed as that of an adult" and juveniles' "personality traits are more transitory, less fixed." Id. at 570. As a result, "it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of

16

irretrievably depraved character." Id. "Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" Id. (quoting Johnson v. Texas, 509 U.S. 350, 368 (1993)).

Against this backdrop, Graham held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at 74. The Court explained that "[t]his clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment." Id. (emphasis added). In reaching this conclusion, the Court again highlighted the "lessened culpability" of juveniles, noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." Id. at 68. Moreover, "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of an 'irretrievably depraved character' than are the actions of adults." Id. (quoting Roper, 543 U.S. at 570).

Graham explained that life without parole is "the second

17

most severe penalty permitted by law," behind only the death penalty, because it "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—-the remote possibility of which does not mitigate the harshness of the sentence." Id. at 69-70 (citations omitted).  If a juvenile is sentenced to life in prison without the possibility of parole, he or she has "no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." Id. at 79.

Additionally, "[b]y denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society.  This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." Id. at 74. Accordingly, the sentence of life without parole for a juvenile nonhomicide offender will always be "disproportionate" under the Eighth Amendment because it always relies on a judgment "made at the outset" that the defendant is incorrigible. Id. at 73.  And while some juvenile offenders may ultimately prove to pose a risk to society for the rest of their lives, "[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity" later in life. Id. at 73 (emphasis added).

Although Graham left it to "the State[s], in the first

18

instance, to explore the means and mechanisms" to comply with its dictates, id. at 75, the decision established at least three minimum requirements for parole or early release programs for juvenile nonhomicide offenders sentenced to life imprisonment, like Petitioner.[3]

First, Graham held that such offenders must have the opportunity "to obtain release based on demonstrated maturity and rehabilitation." Id. at 75 (emphasis added). Put differently, the juvenile offender must have a "chance to later demonstrate that he is fit to rejoin society" and that "the bad acts he committed as a teenager are not representative of his true character." Id. at 79. To that end, a parole or early release system does not comply with Graham if the system allows for the lifetime incarceration of a juvenile nonhomicide offender based solely on the heinousness or depravity of the offender's crime. Id. at 75 ("[The Eighth Amendment] prohibit[s] States from making the judgment at the outset that [juvenile nonhomicide offenders] never will be fit to reenter society."); id. at 76 (stating that the Eighth Amendment prohibits courts

---

[3] We address these three requirements because they are particularly relevant to the Geriatric Release program and Petitioner's state court adjudication. We take no position on whether Graham established--clearly or otherwise--other minimum requirements for parole or early release programs for juvenile nonhomicide offenders sentenced to life imprisonment.

19

"from sentencing a juvenile nonhomicide offender to life without parole based on a subjective judgment that the defendant's crimes demonstrate an 'irretrievably depraved character'" (quoting Roper, 543 U.S. at 572)).

Second, Graham held that the opportunity to obtain release must be "meaningful," which means that the opportunity must be "realistic" and more than a "remote possibility." Id. at 70, 75, 82. Graham's "meaningful[ness]" requirement reflects the Supreme Court's long-standing characterization of "[p]arole [a]s a regular part of the rehabilitative process. Assuming good behavior, it is the normal expectation in the vast majority of cases." Solem, 463 U.S. at 300-03. Because parole is the "normal expectation," it should be "possible to predict, at least to some extent, when parole might be granted." Id. (holding that, for purposes of the Eighth Amendment, executive clemency is not a substitute for parole because clemency is an "ad hoc" process that provides inmates with nothing more than a "bare possibility" of release). To that end, Graham held that the availability of executive clemency did not satisfy the "meaningful opportunity to obtain release" requirement. 560 U.S. at 69-70.

Third, Graham held that a state parole or early release program must account for the lesser culpability of juvenile offenders: "An offender's age is relevant to the Eighth

Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." Id. at 76; see also Miller v. Alabama, 132 S. Ct. 2455, 2465-66 (2012) (explaining that Graham's "foundational principle" is "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children").[4] Accordingly, a state parole or early release system that subjects juvenile offenders to more severe punishments than their adult counterparts necessarily violates Graham.

C.

With these three principles in mind--(1) that juvenile nonhomicide offenders sentenced to life imprisonment must have the "opportunity to obtain release based on demonstrated maturity and rehabilitation," (2) that this opportunity must be "meaningful," and (3) that the early release or parole system

---

[4] The Supreme Court decided Miller after Petitioner's state-court adjudication. Although Petitioner may obtain relief only based on law clearly established by the Supreme Court as of the date of his adjudication, we may look to decisions post-dating his adjudication for guidance regarding the interpretation and application of clearly established Supreme Court precedent predating the state court adjudication. See, e.g., Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (relying on post-adjudication opinion to "illustrat[e] . . . proper application" of clearly established precedent); Frazer v. South Carolina, 430 F.3d 696, 716 (4th Cir. 2005) (Motz, J., concurring) ("Where . . . a Supreme Court decision post-dating state collateral review . . . simply illustrates the appropriate application of Supreme Court precedent that pre-dates the state-court determination . . . , a federal court on habeas may consider the postdated opinion.").

21

must take into account the lesser culpability of juvenile offenders--we must determine whether the conclusion of the trial court and Angel that Geriatric Release complies with Graham's parole requirement was "contrary to, or an unreasonable application of" Graham.[5]

1.

A state court adjudication is contrary to clearly established law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially

---

[5] It is important to note that this case does not present the question of whether a lengthy term-of-years sentence for a juvenile is the functional equivalent of life without parole under Graham. That question has thus far divided courts. Compare Bunch, 685 F.3d at 550 (holding that Graham did not clearly establish that an lengthy term-of-years sentence for a juvenile offender would violate the Eighth Amendment), Vasquez v. Commonwealth, 781 S.E.2d 920, 925 (Va. 2016) (holding that Graham did not address term-of-years sentences, even if they exceed the prisoner's life expectancy), and State v. Brown, 118 So. 3d 332, 342 (La. 2013) (concluding that Graham did not reach term-of-years sentences), with Moore, 725 F.3d at 1186 (holding that Graham clearly prohibited a sentence under which a juvenile offender who would not be eligible for parole until age 144), Casiano v. Comm'r of Corr., 115 A.3d 1031, (Conn. 2015) (holding that "a fifty year term and its grim prospects for any future outside of prison effectively provide a juvenile offender with 'no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope'" (quoting Graham, 560 U.S. at 79)), Bear Cloud v. State, 334 P.3d 132, 136, 141–42 (Wyo. 2014) (holding that a sentence that would keep the defendant in prison until age sixty-one was the functional equivalent of a life sentence), and State v. Null, 836 N.W.2d 41, 72 (Iowa 2013) (holding that "Miller's principles are fully applicable to a lengthy term-of-years sentence").

22

indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." Williams v. Taylor, 529 U.S. 362, 405 (2000); Barbe v. McBride, 521 F.3d 443, 453-54 (4th Cir. 2006).

Here, Angel, upon which the state trial court entirely relied, correctly identified Graham as controlling and recognized each of the three minimum requirements set forth above for a parole or early release program for juvenile nonhomicide offenders sentenced to life imprisonment. In particular, Angel repeatedly stated that Graham requires that juvenile offenders be afforded an opportunity for "release based on maturity and rehabilitation." 704 S.E.2d at 402. Likewise, the Angel court acknowledged that the opportunity for release must be "meaningful." Id.[6] And Angel recognized that Graham demands that state penal systems account for the "limited moral culpability of juvenile offenders." Id. at 401. Accordingly, Petitioner's state court adjudication was not "contrary to" Graham. Bell v. Cone, 535 U.S. 685, 698 (2002) (holding that

---

[6] Notwithstanding their contention that Graham "does not address what type of parole is necessary to meet its standard," Respondents concede that Graham held that juvenile nonhomicide offenders sentenced to life imprisonment must have the opportunity to "obtain release based on maturity and rehabilitation" and that this opportunity must be "meaningful." Appellants' Br. at 37, 49. Accordingly, even Respondents concede that Graham establishes minimum requirements for parole or early release programs.

23

state court adjudication that "correctly identified the principles announced [by the Supreme Court] as those governing the analysis . . . was [not] contrary to . . . clearly established law").

2.

Petitioner, therefore, may obtain relief only if his state court adjudication amounted to an "unreasonable application" of Graham. A state court decision amounts to an "unreasonable application" of clearly established Supreme Court precedent if it "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of the prisoner's case." Grueninger, 813 F.3d at 524 (quoting Wiggins, 539 U.S. at 520). To satisfy this standard, the state court adjudication must be "more than incorrect or erroneous;" it must be "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75 (2003). That being said, to reach a decision that constitutes an "unreasonable application" of Supreme Court precedent, a state court need not address an identical factual or legal scenario to that previously addressed by the Supreme Court: "even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007).

24

For several reasons, we agree with Petitioner that his state court adjudication constituted an "unreasonable application" of Graham.

First, Geriatric Release does not necessarily provide Petitioner--or any other inmate, juvenile or otherwise--the opportunity to obtain release "based on demonstrated maturity and rehabilitation," as Graham requires. In concluding that Geriatric Release satisfied this requirement, Angel emphasized that "if the prisoner meets the qualifications for consideration contained in the statute, the factors used in the normal parole consideration process apply to conditional release decisions under this statute." 704 S.E.2d at 402. Assuming arguendo the "decision factors" used in the normal parole consideration process adequately account for a juvenile offender's "maturity and rehabilitation,"[7] this conclusion ignores the Parole Board's authority to deny Geriatric Release for any reason--and without consideration of the "decision factors"--and therefore is objectively unreasonable.

---

[7] The dissent incorrectly asserts that we conclude that the parole "decision factors" do not account for a juvenile offender's "maturity and rehabilitation." Post at 19. To the contrary, because the Parole Board may deny a juvenile offender Geriatric Release at the Initial Review stage without considering the "decision factors," we need not--and thus do not--decide whether the "decision factors" adequately account for a juvenile offender's "maturity and rehabilitation," as Graham requires.

25

Under the Geriatric Release Administrative Procedures, the Parole Board must consider the "decision factors"--the "factors used in the normal parole consideration process"--during the Assessment Review stage. But the Parole Board may deny a petition for Geriatric Release for any reason--without consideration of the "decision factors"--at the Initial Review stage. It was objectively unreasonable to conclude that Geriatric Release satisfied Graham's requirement that juvenile offenders be able to obtain release "based on maturity and rehabilitation," when, under the plain and unambiguous language of the governing procedures, the Parole Board can deny every juvenile offender Geriatric Release for any reason whatsoever.[8]

Like Respondents, the dissent seeks to insulate Angel from collateral review by claiming that "the Virginia Supreme Court's conclusion that Virginia law requires consideration of 'normal parole factors' such as rehabilitation and maturity is one of state law and thus is binding on this court." Post at 19-20. But, contrary to Respondents' and the dissent's

---

[8] Because the Geriatric Release Administrative Procedures do not require consideration of maturity and rehabilitation--or any other factors--we need not, and thus do not, decide whether a statute or regulation requiring only that a state decision-maker consider "maturity and rehabilitation" satisfies Graham's requirement that juvenile offenders have the opportunity to obtain release "based on demonstrated maturity and rehabilitation." 560 U.S. at 75 (emphasis added).

26

characterization, Angel does not hold that the Geriatric Release Administrative Procedures "require" consideration of the "decision factors." Rather, Angel states that the "decision factors" "apply to conditional release decisions," but never addresses whether--much less holds that--the Parole Board must consider the "decision factors" in reviewing every petition for Geriatric Release. 704 S.E.2d at 402 (emphasis added).

Indeed, by reading Angel as "requir[ing]" consideration of the "decision factors," the dissent puts Angel into direct conflict with the plain language of the Geriatric Release Administrative Procedures, which permit the Parole Board to deny a petition for Geriatric Release at the Initial Review stage for any reason, and without consideration of the "decision factors." See supra Part II. But in predicting how state courts would resolve an unsettled issue of state law, we must reject, if at all possible, predictions that would ascribe absurd or irrational conclusions to state courts. See, e.g., Pena v. Greffet, 110 F. Supp. 3d 1103, 1134 (D.N.M. 2015) (refusing to predict that state court would resolve unsettled issue of state law in a way that "would produce absurd results"); Union Cnty. Ill. v. MERSCORP, Inc., 920 F. Supp. 2d 923, 931 (S.D. Ill. 2013) (adopting prediction of state law that was "[t]he only non-absurd, non-inconvenient way to read the language of the law itself and the language of Illinois appellate courts"); Jakomas

27

v. McFalls, 229 F. Supp. 2d 412, 424 (W.D. Pa. 2002) (rejecting plaintiff's contention that state court would interpret state law in a way that would lead to an "absurd result"). Accordingly, we refuse to read Angel's description of the Geriatric Release Administrative Procedues as "apply[ing]" the "decision factors" as requiring that the Parole Board consider those factors at the Initial Review stage, as the dissent proposes.

Contrary to the dissent's position, Angel's error is not that it irrationally interpreted the Geriatric Release Administrative Procedures as requiring consideration of the "decision factors." Rather, Angel unreasonably concluded that the potential for consideration of maturity and rehabilitation at the Assessment Review stage is adequate to comply with Graham's requirement that States afford juvenile nonhomicide offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," 569 U.S. at 75, when the Procedures allow the Parole Board to deny Geriatric Release for any reason at the Initial Review stage and therefore provide no guarantee that the Parole Board will consider a juvenile offender's maturation and rehabilitation--a question of federal constitutional law. Indeed, under the Geriatric Release Administrative Procedures, the Parole Board could allow Petitioner to die in prison without ever having considered

28

whether Petitioner had matured or was rehabilitated. Graham does not countenance such a possibility. 560 U.S. at 74, 79 (rejecting sentences of life without parole for juvenile nonhomicide offender because such a penalty "guarantee[s] [the offender] will die in prison without any meaningful opportunity to obtain release" and "foreswears altogether the rehabilitative ideal").

Geriatric Release also fails to comply with Graham's requirement that juvenile offenders have the opportunity to obtain release "based on demonstrated maturity and rehabilitation" because it allows for the lifetime incarceration of a juvenile nonhomicide offender based solely on the heinousness or depravity of the offender's crime. Data provided by the Virginia Criminal Sentencing Commission shows that, to date, 95.4 percent of the denials of Geriatric Release have been based on the "serious nature of the crime." J.A. 178.[9]

---

[9] The Sentencing Commission's 95.4 percent figure reflects adjudications of Geriatric Release petitions filed by adult offenders only. There is no data available regarding adjudications of Geriatric Release petitions by juvenile offenders because no juvenile offender sentenced to life imprisonment without parole in Virginia has reached the age of sixty. Respondents maintain the absence of data on the adjudication of Geriatric Release petitions by juvenile offenders precludes reliance on this data. We agree with the district court, however, that "[c]ompelling juveniles who are currently serving sentences of life without the possibility of parole to wait until enough similarly situated juveniles reach age sixty so that courts can reassess the probabilities and (Continued)

29

Accordingly, the Parole Board denies Geriatric Release petitions in <u>nearly every case</u> on grounds that the petitioners' "crimes demonstrate an 'irretrievably depraved character'"--directly contrary to <u>Graham</u>'s instruction that state penal regimes take into account a juvenile nonhomicide offender's greater "capacity for change" relative to his adult counterparts by giving such offender the opportunity "to demonstrate that the bad acts he committed as a teenager are not representative of his true character." 560 U.S. at 73, 79.

For this reason, the dissent misconstrues <u>Graham</u> when it appeals to the conduct giving rise to Petitioner's conviction and Petitioner's conduct at sentencing to justify its position. <u>Post</u> at 5-6. Rather, <u>Graham</u> forbids States from making a "judgment . . . at the outset" that a juvenile offender is incorrigible" because juvenile offenders have a "capacity for change." 560 U.S. at 73, 79.

A second reason Petitioner's adjudication was objectively unreasonable is that the Geriatric Release program does not offer juvenile nonhomicide offenders the "meaningful" opportunity for release traditionally afforded by parole.

---

statistics related to geriatric release perpetuates the injustice that <u>Graham</u> sought to correct." <u>LeBlanc</u>, 2015 WL 4042175, at *17.

30

Tellingly, when analyzing whether Geriatric Release complied with Graham, the Angel court said that "the effect of [the juvenile defendant's life] sentences is that [he] will spend the rest of his life confined in the penitentiary." 704 S.E.2d at 401 (emphasis added). The Supreme Court of Virginia, therefore, expected the defendant in Angel--who was 17 when he committed his offenses and less than 4 years older when the Supreme Court of Virginia decided his appeal--would spend his life jail, notwithstanding the availability of Geriatric Release and that the defendant had had only four years to "grow[] and matur[e]." Graham, 560 U.S. at 73. But under clearly established Supreme Court precedent--precedent repeatedly relied on by Graham, id. at 70--"parole" should be the "normal expectation in the vast majority of cases," Solem, 463 U.S. at 300-03. It was objectively unreasonable, therefore, for the Supreme Court of Virginia to take the position that a penal regime under which it concedes early release is the exception, rather than the expectation, complies with Graham's meaningfulness requirement.

Relatedly, Geriatric Release also fails to satisfy the "meaningful" opportunity requirement because there are no standards governing the denial of Geriatric Release petitions. In the context of determining whether a life sentence without parole complied with the Eighth Amendment, the Supreme Court explained that "[t]he law generally specifies when a prisoner

31

will be eligible to be considered for parole, and details the standards and procedures applicable at that time," allowing prisoners "to predict, at least to some extent, when parole might be granted." Id. at 300-01. By contrast, mechanisms that allow a decision-maker to grant or deny early release "for any reason without reference to any standards," offer inmates nothing more than a "bare possibility" of release and therefore do not constitute "parole" for purposes of the Eighth Amendment.[10] Id. at 301.

As explained above, the Geriatric Release statute does not provide the Parole Board with any guidance regarding what factors it must consider in deciding whether to release a geriatric prisoner. See supra Part II.A. And, as Petitioner correctly notes, the Geriatric Release Administrative Procedures

---

[10] The dissent claims that Graham only "requir[es] that the parole board have an ability to consider . . . evidence [of maturity and rehabilitation] in deciding whether the offender should be released." Post at 22 (emphasis added). Graham's holding that executive clemency does not comply with the "meaningful opportunity for release" requirement belies the dissent's assertion. In particular, notwithstanding that an executive has unfettered discretion to grant clemency--and therefore is "able" to consider an offender's rehabilitation and maturity in deciding whether to grant clemency--executive clemency does not comply with Graham's parole requirement because it is an "ad hoc" process without any governing standards. 560 U.S. at 69-70 (citing Solem, 463 U.S. at 300-01). For purposes of Graham, the key issue is not whether the Parole Board is "able" to consider a juvenile offender's rehabilitation and maturity--it is whether the Parole Board must consider rehabilitation and maturation. See supra.

32

authorize the Parole Board to deny a petition for Geriatric Release at the Initial Review stage <u>for any reason</u>. Without any statutory or administrative guidance regarding what constitutes a "compelling reason" warranting release or setting forth the criteria for denying a juvenile offender's petition for Geriatric Release at the Initial Review stage, it is impossible to predict whether and when--if at all--the Parole Board will grant Geriatric Release. Accordingly, Geriatric Release does not afford juvenile nonhomicide offenders the "meaningful" opportunity to obtain release to which <u>Graham</u> entitles them. <u>See</u> <u>Graham</u>, 560 U.S. at 69-70 (holding that executive clemency, which the Supreme Court has recognized lacks governing standards, did not constitute "meaningful opportunity to obtain release" for juvenile offenders sentenced to life imprisonment).

Third, the state courts unreasonably concluded that the Geriatric Release program complies with <u>Graham</u>'s dictate that state punishment regimes account for the lesser culpability of juvenile offenders. In particular, even if the Parole Board wa required to consider the "decision factors" in deciding whether to grant a petition for Geriatric Release--which it is not--a prisoner's youth at the time of his offense is not among those decision factors. Therefore, neither the Geriatric Release statute nor the Geriatric Release Administrative Procedures

33

require that the Parole Board consider the "special mitigating force of youth," Thompson, 487 U.S. at 834, as Graham requires.

More significantly--and as the district court correctly noted--Geriatric Release treats juvenile offenders sentenced to life imprisonment "worse" than adult offenders receiving the same sentence because juvenile offenders "must serve a larger percentage of their sentence than adults do before eligibility to apply for geriatric release." LeBlanc, 2015 WL 4042175, at *14. For example, under Geriatric Release, a fifty-year-old sentenced to life in prison will be eligible to apply for Geriatric Release in ten years, but a sixteen-year-old will have to serve forty-four years before receiving his first opportunity to apply for Geriatric Release. Graham emphasized that a life sentence is "especially harsh" for a juvenile offender relative to an adult offender because, under such a sentence, the "juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." 560 U.S. at 70. Given that (1) the Supreme Court specifically held that sentencing systems that require juvenile offenders to serve more years and/or a greater percentage of their lives relative to adult offenders violate the Eighth Amendment's proportionality principle and that (2) Geriatric Release subjects juvenile offenders to longer--and proportionately longer--sentences, it was objectively

34

unreasonable to conclude that Geriatric Release complied with Graham.

3.

The dissent does not dispute that the Geriatric Release Administrative Procedures permit the Parole Board to deny a petition for Geriatric Release for any reason at the Initial Review stage, without consideration of the "decision factors," post at 21-22, contrary to Graham's holding that juvenile nonhomicide offenders sentenced to life imprisonment must have an opportunity "to obtain release based on demonstrated maturity and rehabilitation," 560 U.S. at 75 (emphasis added). And the dissent does not dispute that Geriatric Release subjects juvenile offenders, on average, to longer—-and proportionately longer—-sentences, post at 23, contrary to Graham's dictate that state penal regimes account for the lesser culpability of juvenile offenders, 560 U.S. at 76. Nonetheless, the dissent maintains that Petitioner is not entitled to relief because we fail to afford his state court adjudication the level of deference Section 2254(d)(1) requires, as the Supreme Court interpreted that provision in Harrington v. Richter, 562 U.S. 86 (2011). We disagree.

In Harrington, the petitioner claimed that his state court adjudication amounted to an unreasonable application of the test for ineffective assistance of counsel set forth in Strickland v.

35

<u>Washington</u>, 466 U.S. 668 (1984). <u>Harrington</u>, 562 U.S. at 105. In rejecting the petition, the Supreme Court explained that "[t]he standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so . . . ." <u>Id.</u> at 105 (quoting <u>Strickland</u>, 466 U.S. at 689; <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009)).

Notably, <u>Harrington</u> further explained that "evaluating whether a rule application was unreasonable [for purposes of Section 2254(d)(1)] requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Id.</u> at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). The Court held that the <u>Strickland</u> standard "is a general one, so the range of reasonable applications is substantial." <u>Id.</u> at 105 (citing <u>Knowles</u>, 556 U.S. at 123). This echoes the Court's earlier pronouncement in <u>Yarborough</u>, upon which the dissent also relies: "If a legal rule is specific . . . [a]pplications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment." 541 U.S. at 664; <u>see</u> <u>post</u> at 13. Thus, determining whether a state court's decision was "unreasonable" for purposes of Section 2254(d)(1)

36

depends on the specificity of the constitutional rule the state court applied.

A court applying Strickland must determine two things: that the defendant's counsel's representation "fell below an objective standard of reasonableness," and that the deficient performance was "prejudicial to the defense." 466 U.S. at 687–91. By contrast, Graham set forth a categorical rule barring sentences of life without parole for juvenile nonhomicide offenders. 560 U.S. at 77–79. And Graham clearly established that parole or early release programs for such offenders must (1) provide an opportunity to obtain release "based on demonstrated maturity and rehabilitation" and (2) account for the lesser culpability of juvenile offenders. See supra Part III.A. The Court characterized these minimum requirements as establishing a "boundar[y]" on state courts' authority to make "case-by-case" sentencing determinations. 560 U.S. at 77. Accordingly, Graham's categorical rule and its minimum requirements for parole or early release programs do not afford state courts the same "leeway" that the "reasonableness" and "prejudice" components of Strickland permit. Indeed, the dissent misconstrues Harrington when it affords the same "doubly" deferential review to Petitioner's state court adjudication as federal courts apply in reviewing state court decisions applying Strickland.

37

Contrary to the dissent, we do not engage in de novo review. Rather, we hold that the Supreme Court of Virginia unreasonably applied Graham when it acknowledged Graham's minimum requirements for parole or early release programs for juvenile nonhomicide offenders sentenced to life imprisonment but concluded that Geriatric Release—-which permits the Parole Board to deny petitions for Geriatric Release without ever considering a petitioner's maturity or rehabilitation and which treats juvenile offenders worse than adult offenders--complied with those requirements.

## IV.

Nevertheless, Respondents and the dissent seek refuge in Supreme Court's statement that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" with Graham's requirements. Appellants' Br. at 24, 38, 42-43; post at 2. According to Respondents and the dissent, this single sentence effectively immunized Petitioner's sentence--and those of all other juvenile nonhomicide offenders sentenced to life imprisonment eligible for any form of early release other than executive clemency--from collateral review.

But the Supreme Court's proper regard for States' independent judgment regarding how best to operate their penal systems does not, "[e]ven in the context of federal habeas, . . . imply abandonment or abdication of judicial review." Miller-

38

El v. Cockrell, 537 U.S. 322, 340 (2003). This is particularly true when, as here, the Supreme Court clearly sets forth minimum constitutional requirements to guide state courts' and policymakers' decisions--requirements that the Supreme Court of Virginia readily determined from the plain language of Graham.

In sum, we hold that notwithstanding its recognition of Graham's "governing legal principles," the Supreme Court of Virginia unreasonably concluded that Geriatric Release--a program that predated Graham by more than 15 years, that permits the Parole Board to deny release for any reason whatsoever, and that treats juvenile offenders worse than adult offenders--complies with Graham's parole requirement. Accordingly, we affirm the district court's decision and remand so that the Petitioner can be resentenced in accordance with Graham and the Eighth Amendment.

AFFIRMED

39

NIEMEYER, Circuit Judge, dissenting:

In affirming the grant of Dennis LeBlanc's habeas petition brought under 28 U.S.C. § 2254, the majority holds that the Virginia Supreme Court concluded unreasonably that Virginia's geriatric release program provided a meaningful opportunity for release to juveniles and therefore satisfied the requirements of Graham v. Florida, 560 U.S. 48 (2010). Graham forbids sentencing juveniles to life in prison without parole for nonhomicide crimes. In reaching its conclusion, the majority relies simply on its expressed disagreement with the Virginia Supreme Court's decision in Angel v. Commonwealth, 704 S.E.2d 386 (Va. 2011), and effectively overrules it. The Virginia court's opinion, however, is demonstrably every bit as reasonable as the majority's opinion in this case and should be given deference under § 2254(d)(1).

After 16-year-old LeBlanc raped a 62-year-old woman in Virginia Beach, Virginia, in 1999, he was convicted in the Virginia Beach Circuit Court of abduction and rape. The court sentenced him in 2003 to life imprisonment on each count. While Virginia had, in 1994, abolished traditional parole for felony offenders, see Va. Code Ann. § 53.1-165.1, it had at the same time adopted a "geriatric release" program that allows for the conditional release of inmates who serve at least 10 years of their sentence and reach the age of 60, see id. § 53.1-40.01.

In 2010, the U.S. Supreme Court handed down its decision in Graham, where it held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at 74. The Court explained that a State must provide this class of juvenile offenders "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," but that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." Id. at 75.

In its first application of Graham, the Virginia Supreme Court held that the factors Virginia applies in considering candidates for geriatric release were the same as "the factors used in the normal parole consideration process" and that, while Virginia's geriatric release program had "an age qualifier," it nonetheless afforded inmates, including juvenile offenders, "the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' required by the Eighth Amendment." Angel, 704 S.E.2d at 402 (quoting Graham, 560 U.S. at 75).

After Angel had been decided, LeBlanc filed a motion in the Virginia Beach Circuit Court to vacate his sentence as invalid under Graham. The Circuit Court denied his motion, relying on Angel to conclude that Virginia had "an appropriate mechanism in place" to enable LeBlanc "to receive some form of parole." But when LeBlanc sought federal habeas relief under 28 U.S.C.

41

§ 2254, the district court granted LeBlanc's petition, concluding, contrary to the Virginia court's decision, that Virginia's geriatric release program fell short of Graham's requirements.

In now affirming, the majority unfortunately fails to respect, in any meaningful way, the deference Congress requires federal courts to give to state court decisions on post-conviction review under § 2254. Under even a loose application of the governing standard in § 2254(d), a reviewing federal court would be constrained to conclude that the Virginia Beach Circuit Court's ruling was not contrary to or an unreasonable application of Graham. See 28 U.S.C. § 2254(d)(1). To hold otherwise would require finding that the Virginia Supreme Court's decision in Angel, as well as the Virginia Beach Circuit Court's decision relying on it, amounted to an "extreme malfunction in the state criminal justice system." Harrington v. Richter, 562 U.S. 86, 102 (2011).

To reach its conclusion that Virginia's geriatric release program does not provide juveniles with a meaningful opportunity to obtain release, the majority conducts its own de novo review of the program, concluding that the program lacks "governing standards" for release. The majority, however, fails to recognize that our task on a § 2254 habeas petition is not to evaluate state parole systems de novo but rather to determine

42

whether the Virginia Supreme Court's evaluation of its own program was an unreasonable application of Graham, see 28 U.S.C. § 2254(d)(1), which it clearly was not. Graham held that the Eighth Amendment forbids States from determining, at the time of sentencing, that a juvenile offender who did not commit a homicide "never will be fit to reenter society," 560 U.S. at 75 (emphasis added), and that such offenders must have "a chance to demonstrate growth and maturity," id. at 73. Analyzing the sufficiency of Virginia's geriatric release program under Graham, the Virginia Supreme Court reasonably concluded that the program, which employs the same "factors used in the normal parole consideration process," provides nonhomicide juvenile offenders with "the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' required by the Eighth Amendment." Angel, 704 S.E.2d at 402 (quoting Graham, 560 U.S. at 75). While the majority may disagree with the Virginia Supreme Court's conclusion, the fact that it was reasonable precludes LeBlanc from obtaining relief under § 2254.

Moreover, beyond this case, the majority's approach will encourage federal courts to scrutinize state policies and parole determinations under similar systems, a result that Congress clearly intended to forestall when it imposed the restrictions stated in § 2254. Indeed, the Supreme Court also sought to avoid this result by explicitly leaving the application of

43

<u>Graham</u> to the States.  <u>See</u> <u>Graham</u>, 560 U.S. at 75 (noting that it is for the State "to explore the means and mechanisms for compliance").

At bottom, when applying the prescribed standards to evaluate the Virginia court's application of <u>Graham</u>, it is clear that LeBlanc's petition for a federal writ of habeas corpus must be denied.  I now address his petition under those standards.

I

During the morning of July 6, 1999, Dennis LeBlanc, who was at the time 16 years old, asked a 62-year-old woman, who was walking home from a grocery store, for a cigarette.  After the woman told him that she did not smoke, LeBlanc pushed her down, dragged her to nearby bushes, raped her, and stole her purse. When police were later able to match LeBlanc's DNA with that of the sperm sample taken from the woman, LeBlanc was charged and convicted in the Virginia Beach Circuit Court of rape, in violation of Virginia Code § 18.2-61, and abduction with intent to defile, in violation of Virginia Code § 18.2-48.  He was sentenced to life imprisonment on each count in March 2003.  The court noted that "the two offenses have to be some of the most serious charges I've ever heard about."  When imposing life imprisonment, the court did not mention parole, as traditional parole had been abolished in 1994 when the geriatric release

44

program was adopted.* In response to the sentence given, LeBlanc told the court twice, "F--k you."

More than seven years after LeBlanc's sentencing, the Supreme Court decided Graham, holding for the first time that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at 74 (emphasis added). The Court explained that while "[a] State [was] not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," it was required to provide the juvenile offender with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 75. The Court, however, directed that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" with that command. Id.

After the Graham decision had been handed down, the Virginia Supreme Court considered whether Virginia's geriatric release program satisfied Graham's requirements, and it held that the program did so. See Angel, 704 S.E.2d at 402. More specifically, the court explained that Virginia's geriatric

---

* The majority claims that LeBlanc was sentenced to "life imprisonment without parole," ante at 3 (emphasis added), but its statement begs the question. LeBlanc was sentenced simply to life imprisonment, and, at the time, his sentence allowed for the possibility of release under Virginia's geriatric release program, leaving the question whether the program functions as a form of parole.

45

release program, as set forth in Virginia Code § 53.1-40.01, allows for the conditional release of inmates when they reach age 60 and have served 10 years and that "the factors used in the normal parole consideration process" apply to such determinations.  Id.  The court concluded that, "[w]hile [the geriatric release program] has an age qualifier, it provides . . . the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' required by the Eighth Amendment."  Id. (quoting Graham, 560 U.S. at 75).

In May 2011, several months after Angel was decided, LeBlanc filed a motion in the Virginia Beach Circuit Court to vacate his life sentence as invalid under Graham.  He contended that Angel was wrongly decided and that he did not indeed have a meaningful opportunity for release.  The Circuit Court, however, denied LeBlanc's motion, explaining:

> [The] Supreme Court of Virginia has already looked at this issue in the Angel case and determined that there was an appropriate mechanism in place . . . for a defendant to receive some form of parole as enunciated in [Graham], and they denied Mr. Angel's appeal. . . . The court feels and finds and is so ordering that there is an appropriate mechanism in place, that the sentence rendered back in 2003 for Mr. LeBlanc . . . in which the defendant received two life sentences . . . was the appropriate sentence . . . .

(Emphasis added).  The Virginia Supreme Court summarily denied LeBlanc's petitions for appeal and for rehearing.

46

LeBlanc filed this federal habeas petition pursuant to § 2254, contending again that the Virginia Supreme Court had wrongly decided Angel and that, based on statistics that he had presented to the state court, he had only a "remote possibility of release," which did not amount to the "meaningful opportunity" for release required by Graham. A magistrate judge recommended dismissing LeBlanc's petition, but the district court disagreed and granted the petition, ordering that the Virginia Beach Circuit Court resentence LeBlanc. The district court concluded that "the state court's decision was both contrary to, and an unreasonable application of, clearly established federal law set forth in Graham," explaining that "[t]here is no possibility that fairminded jurists could disagree that the state court's decision conflicts with[] the dictates of Graham." The court noted further that the geriatric release program "falls far short of the hallmarks of compassion, mercy and fairness rooted in this nation's commitment to justice."

From the district court's judgment, the respondents -- the Commonwealth of Virginia and Randall Mathena, the Warden of Red Onion State Prison (collectively herein, the "Commonwealth" or "Virginia") -- filed this appeal.

47

The operative state court decision for our review is the decision of the Virginia Beach Circuit Court. See Grueninger v. Dir., Va. Dep't of Corr., 813 F.3d 517, 525 (4th Cir. 2016) ("'look[ing] through'" the Virginia Supreme Court's summary refusal to review the defendant's appeal and "evaluat[ing] the Circuit Court's reasoned decision"). That decision concluded that Virginia's geriatric release program provides an "appropriate mechanism" for implementing Graham. The Circuit Court relied on the Virginia Supreme Court's opinion in Angel, which applied Graham and concluded that Virginia's geriatric release program, which uses the "normal" parole factors for determining release, provided "the 'meaningful opportunity to obtain released based on demonstrated maturity and rehabilitation' required by the Eighth Amendment." Angel, 704 S.E.2d at 402 (quoting Graham, 560 U.S. at 75).

Faced with the district court's contrary conclusion, we must decide whether the Circuit Court's decision "was contrary to, or involved an unreasonable application of," Graham, 28 U.S.C. § 2254(d)(1).

A

First, to satisfy the requirement of § 2254(d)(1) that the state court decision be shown to be "contrary to" Graham, LeBlanc would have to show (1) that the state court "applie[d] a

rule different from the governing law set forth in [Supreme Court] cases," or (2) that it decided this case "differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). Therefore, "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within [the] 'contrary to' clause." Williams v. Taylor, 529 U.S. 362, 406 (2000).

In this case, no one can seriously argue that the Virginia Beach Circuit Court failed to correctly identify Graham as stating the applicable legal rule. In denying LeBlanc's motion to vacate his sentence, the Circuit Court specifically discussed Graham, noting how "the U.S. Supreme Court in rendering its decision gave the court[s] guidelines to deal with defendants who were juveniles at the time of their offenses." Because the Circuit Court operated under the correct U.S. Supreme Court rules and did not reach an opposite conclusion from the Supreme Court on a question of law, the argument that the Virginia Beach Circuit Court produced a decision "contrary to" Graham can survive only if the facts of Graham were "materially indistinguishable" from LeBlanc's case. Bell, 535 U.S. at 694. But LeBlanc cannot make this showing either.

49

Graham involved a juvenile offender convicted in Florida for a nonhomicide crime, who was sentenced to life in prison without any possibility of parole. As such, his sentence:

> guarantee[d] he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager [were] not representative of his true character, even if he [were to] spend[] the next half century attempting to atone for his crimes and learn from his mistakes.

560 U.S. at 79. Because Florida had abolished its parole system, the life sentence gave Graham "no possibility of release unless he [was] granted executive clemency." Id. at 57 (emphasis added). The Court noted, however, that executive clemency provided Graham only a "remote possibility" of release, id. at 70, and that Florida had effectively "denied him any chance to later demonstrate that he [was] fit to rejoin society," id. at 79. In these circumstances, the Court held that the Eighth Amendment prohibits the imposition of a sentence of life without the possibility of parole for juvenile offenders who commit nonhomicide crimes. Id. at 74.

LeBlanc's case differs materially. Unlike Florida law before Graham, Virginia's geriatric law affords a juvenile sentenced to life imprisonment some opportunity for release. The geriatric law provides in relevant part:

> Any person serving a sentence imposed upon a conviction for a felony offense . . . who has reached the age of sixty or older and who has served at least

50

> ten years of the sentence imposed may petition the Parole Board for conditional release. The Parole Board shall promulgate regulations to implement the provisions of this section.

Va. Code Ann. § 53.1-40.01. And the Virginia Supreme Court -- the ultimate authority on Virginia law -- has construed "[t]he regulations for conditional release under [§ 53.1-40.01] [to] provide that if the prisoner meets the qualifications for consideration contained in the statute, <u>the factors used in the normal parole consideration process apply</u> to conditional release decisions under this statute." <u>Angel</u>, 704 S.E.2d at 402 (emphasis added). Thus, LeBlanc cannot show that the facts in <u>Graham</u>, where the prisoner enjoyed no opportunity for release outside of clemency, are materially indistinguishable from the facts of this case, where LeBlanc has an opportunity to be released by the Parole Board.

B

Second, LeBlanc is also unable to demonstrate that the decision by the Virginia Beach Circuit Court, applying <u>Angel</u>, was an "unreasonable application of" <u>Graham</u>. <u>See</u> 28 U.S.C. § 2254(d)(1). To satisfy this requirement, LeBlanc would have to show that, even "if the state court identifie[d] the correct governing legal principle from [Supreme Court] decisions," it "unreasonably applie[d] that principle to the facts of the . . . case." <u>Williams</u>, 529 U.S. at 365. And to show that the state

51

court unreasonably applied governing legal principles, he would have to show that the state court's decision was "'objectively unreasonable,'" rather than "merely wrong" or involving "clear error." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).

To emphasize the difficulty of meeting this standard, the Supreme Court has said that a prisoner would have to show "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103; see also id. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision" (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004))). Not surprisingly, the rare decision finding § 2254(d)(1) satisfied typically arises from the misapplication of a long-established Supreme Court standard. See, e.g., Rompilla v. Beard, 545 U.S. 374, 389 (2005) (finding it was objectively unreasonable for the state court to conclude that, under Strickland v. Washington, 466 U.S. 668 (1984), capital defense lawyer's failure to consult prior conviction file that was certain to contain aggravating evidence was not

ineffective assistance); Wiggins v. Smith, 539 U.S. 510, 527-28 (2003) (similar for file containing mitigating evidence).

In this case, after the Virginia Beach Circuit Court correctly identified Graham as the governing law, it applied that decision to the facts of LeBlanc's case. In doing so, the Circuit Court considered the Graham requirement that States must provide a mechanism that affords a juvenile sentenced to life imprisonment "a meaningful opportunity for release." Since the Graham Court stated that its holding applied only to juvenile offenders convicted of a nonhomicide crime and sentenced to life imprisonment without parole, Graham, 560 U.S. at 75, and since the Virginia Supreme Court had held that the geriatric release program employed normal parole factors, the Circuit Court reasonably concluded that LeBlanc's sentence did not violate Graham.

Indeed, it strains credulity to conclude that the Circuit Court's application of Graham was "so lacking in justification" that it fell "beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103. For one, Graham's focus on the parallel between life without parole and the death penalty, see 560 U.S. at 69-70, along with the Court's indictment of life without parole as impermissibly deeming a "juvenile offender forever . . . a danger to society," id. at 72 (emphasis added), suggests that the Court saw no constitutional

53

problem with state parole systems that allow for release only later in life. Indeed, the Court emphasized that "[t]he Eighth Amendment does <u>not</u> foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. <u>It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society</u>." <u>Id.</u> at 75 (emphasis added). Thus, the state court was justified in reading <u>Graham</u>'s Eighth Amendment concerns as limited to traditional sentences of life without any possibility of parole.

Further, <u>Graham</u> did not define the bounds of its singular requirement that a juvenile must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 575 U.S. at 75. Rather, in adopting "[a] categorical rule against life without parole for juvenile nonhomicide offenders," <u>id.</u> at 79, <u>Graham</u> declined to address what characteristics render a parole or release program "meaningful." The Court did not dictate, for example, how frequently a parole board must meet regarding a juvenile nonhomicide offender or when, after a sentence is imposed on the offender, it must first begin meeting. <u>Graham</u> required only that, under a procedure that the Court did not specify, the offender be given a meaningful <u>opportunity</u> for release based on demonstrated maturity and rehabilitation. Given <u>Graham</u>'s leeway

54

with respect to procedures and decisionmaking, the range of permissible state court interpretation is commensurately broad. See Yarborough, 541 U.S. at 664 ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations"). This is for good reason. Federal courts simply cannot be inserting themselves so deeply into state parole procedures that they effectively usurp the role of a state parole board. See Vann v. Angelone, 73 F.3d 519, 521 (4th Cir. 1996) ("It is difficult to imagine a context more deserving of federal deference than state parole decisions").

Affording the proper deference to its interpretation of Graham's broad rule, it is readily apparent that the Virginia Beach Circuit Court operated well within its margin of error in concluding that Virginia's geriatric release program provides a "meaningful opportunity to obtain release." The program includes the Parole Board's review of the inmate's circumstances by considering a range of factors, such as:

- Whether the individual's history, physical and mental condition and character, and the individual's conduct, employment, education, vocational training, and other developmental activities during incarceration, reflect the probability that the individual will lead a law abiding life in the community and live up to all conditions of [geriatric release] if released;

55

- Length of sentence;

- Facts and circumstances of the offense;

- Mitigating and aggravating factors;

- Inter-personal relationships with staff and inmates; and

- Changes in attitude toward self and others.

Virginia Parole Board Policy Manual 2-4 (Oct. 2006). These factors on their face allow for consideration of an offender's maturity, rehabilitation, and youth at the time of the offense. Further, inmates such as LeBlanc know in advance that the Virginia Parole Board will be considering these factors when it determines geriatric release so that "it is possible to predict, at least to some extent, when [geriatric release] might be granted." Solem v. Helm, 463 U.S. 277, 301 (1983). Thus, the Virginia Beach Circuit Court's conclusion, after applying Angel, that Virginia's geriatric release law provided the meaningful opportunity to obtain release, certainly was not "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103; see also id. at 102 ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). To hold otherwise would require a finding in effect that the Virginia Beach Circuit Court judge

56

and the Virginia Supreme Court justices failed to meet the definition of "fairminded jurists." See id. at 101.

LeBlanc concedes, as he must, that the geriatric release program provides some opportunity for release. He argues, rather, that the opportunity is not meaningful because of the low level of success shown by statistics. The statistics to which he refers, however, provide him with minimal support as they relate to older inmates and do not reflect the outcomes of offenders similarly situated to him. Given that Virginia's parole reforms apply only to felony offenders who committed their crimes after 1994, juvenile offenders sentenced after 1994 will not gain eligibility for geriatric release for years to come, as they must first reach the age of 60. A 17-year-old juvenile offender who committed a nonhomicide offense in 1995, for example, would not become eligible for geriatric release until 2038. Because of this timing, relevant statistics for juvenile offenders simply do not exist.

I conclude that, just as the Virginia Beach Circuit Court did not rule "contrary to" Graham, it also was not an "unreasonable application of" Graham to LeBlanc's circumstances within the meaning of § 2254(d)(1).

### III

Nonetheless, the majority, for purposes I do not fully understand, engages in an aggressive effort to prop up LeBlanc's

57

claim. To do so, it rests on its unsupported conclusions that Virginia's geriatric release program does not adequately allow for release "based on maturity and rehabilitation"; that it does not account for youth as a mitigating factor; and that it lacks governing standards. Even if the majority's rigorous, de novo scrutiny of the Virginia court's reasoning did not defy § 2254(d)'s deferential standard of review, its conclusions are demonstrably mistaken on their own terms.

The majority first claims that Virginia's program fails to provide any consideration for the "special mitigating force of youth," ante at 34; see also ante at 30-31, and for an inmate's progress with respect to "maturity and rehabilitation," ante at 28-29. Yet, in the very same opinion, it contradictorily quotes the factors that the Parole Board is required to consider in granting release under the program, noting that the Parole Board is to consider "certain" characteristics of the offender, including "'the individual's history, physical and mental condition and character, . . . conduct, employment, education, vocational training, and other developmental activities during incarceration,' prior criminal record, behavior while incarcerated, and 'changes in motivation and behavior.'" Ante at 9-10 (emphasis added). Saying that these factors do not account for maturity and rehabilitation flaunts reason. But more importantly, the Virginia Supreme Court's conclusion that

58

Virginia law requires considerations of "normal parole factors" such as rehabilitation and maturity is one of state law and thus is binding on this court. And once it is understood that Virginia law requires consideration of maturity and rehabilitation, it follows that, under the § 2254(d) standard, Virginia's geriatric release program satisfied Graham.

Second, the majority's conclusion that the Virginia program lacks "governing standards" for release is puzzling in light of the majority's own description of the Virginia program, which includes a detailed description of the relevant standards:

> The Geriatric Release Administrative Procedures set forth a two-stage review process for Geriatric Release petitions. [Id.] At the "Initial Review" stage, the Parole Board reviews a prisoner's petition -- which must provide "compelling reasons for conditional release" -- and the prisoner's "central file and any other pertinent information." J.A. 287. The Parole Board may deny the petition at the Initial Review stage based on a majority vote. [Id.] Neither the statute nor the Geriatric Release Administrative Procedures states what constitute "compelling reasons for conditional release" nor does either document set forth any criteria for granting or denying a prisoner's petition at the Initial Review stage. [Id.]
>
> If the Parole Board does not deny a petition at the Initial Review stage, the petition moves forward to the "Assessment Review" stage. [Id. at 288] As part of the Assessment Review, a Parole Board member or designated staff member interviews the prisoner. [Id.] During that interview, the prisoner may present written and oral statements as well as any written material bearing on his case for parole. The interviewer then drafts a written assessment of the prisoner's "suitability for conditional release" and, based on that assessment, recommends whether the Parole Board should grant the petition. J.A. 288. In

59

> order to grant geriatric release to a prisoner sentenced to life imprisonment, at least four members of the five-member Parole Board must vote in favor of release. [Id.]
>
> In engaging in the Assessment Review, Parole Board members should consider "[a]ll factors in the parole consideration process including Board appointments and Victim Input." Id. The Virginia Parole Board Policy Manual includes a long list of "decision factors" to be considered in the parole review process. J.A. 297. These factors include: public safety, the facts and circumstances of the offense, the length and type of sentence, and the proposed release plan. [J.A. 297–99.] The Parole Board also should consider certain characteristics of the offender, including "the individual's history, physical and mental condition and character, . . . conduct, employment, education, vocational training, and other developmental activities during incarceration," prior criminal record, behavior while incarcerated, and "changes in motivation and behavior." J.A. 297–99. Finally, the Parole Board should consider impressions gained from interviewing the prisoner as well as information from family members, victims, and other individuals. [J.A. 300.]

Ante at 8-10 (emphasis added; brackets in original).

The majority's effort to bypass the "governing standards" that it quotes is, in essence, an argument that the Parole Board may not deny release without considering the juvenile offender's maturity and rehabilitation and that the Parole Board must, on each application for release, explicitly consider maturity and rehabilitation, regardless of what is presented in the application. This argument, however, reads into Graham far more than the case actually holds. Graham does not dictate parole board procedures and decisionmaking. And, more particularly, it

60

does not limit the permissible factors for denying release. Rather, it requires that the juvenile offender be given an opportunity for release based on "demonstrated maturity and rehabilitation," imposing the burden on the juvenile offender to present evidence of maturity and rehabilitation and in turn requiring that the parole board have an ability to consider that evidence in deciding whether the offender should be released. Within this structure, therefore, when the Virginia Parole Board is presented with a juvenile offender's application that makes a showing of maturity and rehabilitation, the Board is authorized, on the stated factors under which it operates, to grant release. This is just the meaningful opportunity that the Supreme Court describes in Graham. And Angel thus properly held that the Virginia Geriatric Release factors provide that ability to grant release on demonstrated maturity and rehabilitation, particularly in stating that the Parole Board should consider the juvenile offender's developmental activities during incarceration, his behavior while incarcerated, and the changes in his motivation and behavior.

Stated otherwise, under the majority's view, to satisfy Graham a State would have to consider only the Graham factors in considering release, denying the Parole Board the opportunity to consider any of the non-Graham factors that might be relevant to the juvenile offender's application for release and the Board's

decision on that application.  That aggressive reading of Graham would, I think, surprise the Supreme Court that decided it.  But more importantly, it certainly was not unreasonable for the Virginia Circuit Court to understand Graham as not mandating the precise factors that every parole board must consider when reviewing juvenile offenders' applications for release.

The majority also faults the geriatric release program because it allows for longer sentences to juveniles than adults, relying simply on the fact that juveniles commit their crimes earlier in life.  See ante at 21, 34-35.  It is a reality that a person who commits a serious crime at age 35 or, indeed, as a juvenile, will have the possibility of serving more years in prison than a person who commits the same crime at age 62.  But if that reality violates Graham, it is hard to see how any term-of-years sentence for a juvenile could withstand Eighth Amendment scrutiny; a young person's chances of serving a full sentence are inherently higher than an older person's.

Finally, the majority surmises that the Virginia Supreme Court in Angel expected that Angel would spend the rest of his life in jail and that therefore the court's application of Graham was unreasonable because this observation implied that early release would be "the exception, rather than the expectation."  Ante at 31.  This ground for attacking the Virginia Supreme Court can rest only on wild speculation, as no

62

juvenile offender has yet been processed under the State's geriatric release program, and the majority has pointed to no data to predict how the Parole Board will decide applications of juveniles for early release when they first qualify. Graham did not require that juveniles be released at any given time; it required that the juveniles be given a meaningful opportunity to prove themselves and to persuade the Parole Board to grant them release. If the Parole Board is given that authority by law, as the Virginia court found it is, then Graham is satisfied.

In short, the majority has reviewed de novo Virginia's parole criteria based on its own expectations of how the system might work and has failed to appreciate that our sole task on a § 2254 petition is to determine whether the Virginia Supreme Court's decision in applying Graham was unreasonable. And in fulfilling the task given by § 2254, it is not sufficient to show simply that the Virginia Supreme Court was wrong or even committed clear error; rather, it must be shown that the court erred in a manner "well understood and comprehended in existing law," such that its error was "beyond any possibility for fairminded disagreement." See White, 134 S. Ct. at 1702 (quoting Harrington, 562 U.S. at 103).

\*   \*   \*

Because of the limitations of the Supreme Court's holding in <u>Graham</u>, the directly relevant holding by the Supreme Court of Virginia in <u>Angel</u>, and the restrictions imposed by § 2254(d), we are simply not free to grant LeBlanc's habeas petition. Unfortunately, the majority, in its adventuresome opinion, pays only lip service to the required standards of review. Were it to have applied them meaningfully, I submit, the judgment of the district court granting LeBlanc his habeas petition would have to be reversed and the case remanded with instructions to dismiss the petition.